LESTER J. MARSTON
California State Bar No. 081030
LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

Adam P. Bailey (CA Bar No. 278208)
Richard J. Frye (CA Bar No. 338369)
Hobbs, Straus, Dean & Walker, LLP
1903 21st St., 3rd Floor
Sacramento, CA 95811
Phone: (916) 442-9444
Fax: (916) 442-8344
Email: abailey@hobbsstraus.com
rfrye@hobbsstraus.com
*Attorneys for Picayune Rancheria of
Chukchansi Indians dba Chukchansi
Gold Resort & Casino*

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PICAYUNE RANCHERIA OF CHUKCHANSI INDIANS dba CHUKCHANSI GOLD RESORT & CASINO, INC.**<br><br>    Plaintiff,<br><br>    v.<br><br>**UNITE HERE LOCAL # 19**<br><br>    Defendant. | Case No.: 1:25-cv-00846-KES-SKO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF TRIBE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 17, 2025<br>Time: 1:30 p.m.<br>Dept.: 6<br>Before: Hon. Kirk E. Sherriff<br>Action Filed: July 13, 2025<br>Oral Argument Requested |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................ 3

LEGAL STANDARD ....................................................................................... 3

ARGUMENT ..................................................................................................... 4

I.    The Tribe's Ordinance is a Valid Exercise of the Tribe's Retained Civil Regulatory Authority and is Enforceable against the HERE and HERE-Member Employees of CGRC. ....................... 4

II.   The Tribe's Public Assembly Ordinance is Standard among Governments Seeking to Manage Assemblies and Demonstrations to Protect Governmental Interests and the Public Interest. ................................................................................... 9

1.    The Tribe's Public Assembly Ordinance is Content-Neutral, Narrowly Tailored, and Leaves Open Ample Alternative Means of Communication. ................................... 10

2.    The Tribe Seeks Only to have HERE Comply with the Law ............................................................................................ 15

3.    The Public Assembly Ordinance Provides an Appeal to Aggrieved Parties ................................................................ 15

IV.   Tribe's request for a Permanent Injunction Order falls within the permissible bounds of court action despite the Norris–LaGuardia Act. ................................................................... 20

V.    The HERE's Violation of the Tribe's Ordinance Interferes with the Tribe's Right to Self-Government in Violation of Federal Law Causing the Tribe Irreparable Harm. ............................. 22

CONCLUSION ............................................................................................... 24

1

**TABLE OF AUTHORITIES**

2

## Cases

3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .........................................3, 4

4

*Boys Mkts., Inc. v. Retail Clerk's Union*, 398 U.S. 235 (1970) .................. 16, 17, 18

5

*Cardin v. De La Cruz*, 641 F. 2d 363 (9th Cir. 1982).........................................8, 9

6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 3

7

*Cherokee Nation v. Georgia,* 30 U.S. 1 (1831) ..................................................... 1

8

*Chilkat Indian Vill. v. Johnson*, 870 F.2d 1469 (9th Cir. 1989)...........................2, 3

9

*Choctaw Nation of Oklahoma v. State of Oklahoma*, 724 F. Supp. 2d 1182

10

   (W.D. Okla. 2010)...........................................................................................24

11

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ..............................14

12

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)....................11, 12

13

*Coeur d'Alene Tribe v. Hawks*, 933 F.3d 1052 (9th Cir. 2019) .........................2, 3

14

*Comanche Nation v. United States*, 393 F. Supp. 2d 1196 (W.D. Okla. 2005) ......24

15

*Edwards v. City of Coeur d'Alene*, 262 F.3d 856 (9th Cir. 2001)......... 10, 11, 12, 14

16

*EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071 (9th Cir. 2001) ......................23

17

*Ex parte Crow Dog,* 109 U.S. 556 (1883) .............................................................23

18

*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253 (1968)............ 3

19

*Howlett v. Salish & Kootenai Tribes of Flathead Rsrv., Montana*, 529 F.2d 233

20

   (9th Cir. 1976) ................................................................................................10

21

*Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9 (1987)...............................................23

22

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir.

23

   2009) ...............................................................................................................13

24

*Maine v. Taylor*, 477 U.S. 131 (1986).................................................................. 8

25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).............. 3

26

*McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164 (1973)....................10

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) ...............................11, 14

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982).........................4, 5, 7, 23

*Montana v. United States*, 450 U.S. 544 (1981) ...............................................passim

*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074 (9th Cir. 1990) .........2, 3

*N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984)..........13

*N.M. v. Mescalero Apache Tribe*, 462 U.S. 324 (1983).......................................... 6

*New Mexico v. Mescalero Apache Tribe,* 462 U.C. 324 (1983)............................23

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972) ...........................15

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234 (10th Cir. 2001) ...23

*Randall v. Yakima Nation Tribal Ct.*, 841 F.2d 897 (9th Cir. 1988) .....................10

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) ....................................passim

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022

    (9th Cir. 2006) .....................................................................................12, 13

*Scott v. Harris*, 550 U.S. 372 (2007) ...................................................... 3

*Sears v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180 (1978).........19

*Talton v. Mayes*, 163 U.S. 376 (1896)..................................................... 9

*Tom v. Sutton*, 533 F.2d 1101 (9th Cir. 1976) ...........................................10, 15

*United States v. Albertini*, 472 U.S. 675 (1985) ........................................12

*United States v. Cooley*, 593 U.S. 345 (2021) ........................................ 7

*United States v. Kagama,* 118 U.S. 375 (1886) ........................................23

*United States v. Mazurie*, 419 U.S. 544 (1975) ....................................... 4

*United States v. United Mine Workers*, 330 U.S. 258 (1947)........................18, 25

*United States v. Wheeler,* 435 U.S. 313 (1978) ........................................23

*Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015) ...................................24

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................11, 12, 13

*Washington v. Confederated Tribes of Colville Indian Rsrv.*,

    447 U.S. 134 (1980) ........................................................................ 4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802
  (9th Cir. 2011) ............................................................ 1, 5, 6

*Wheeler v. United States,* 435 U.S. 313 (1978) ....................................... 4

*Williams v. Lee,* 358 U.S. 217 (1959)................................... 1, 4, 23, 24

*Worcester v. Georgia,* 31 U.S. 515 (1832) ............................................. 1

**Statutes**

25 U.S.C. § 1302(a)(1)......................................................10

28 U.S.C. § 1362................................................................ 2

29 U.S.C. § 301 ...............................................................18

29 U.S.C. §§ 101 –115, Norris–LaGuardia Act................................................passim

**Other Authorities**

Indian Civil Rights Act, 25 U.S.c. § 1301 *et seq.* ............................................10, 15

**Rules**

Fed. R. Civ. P. 56.........................................................3, 4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

## INTRODUCTION

For over one hundred and fifty years, the law has been settled that within our federal system, Indian tribes are sovereign governmental entities with the right to govern themselves on their reservations under their own laws. *Cherokee Nation v. Georgia,* 30 U.S. 1, 16 (1831); *Worcester v. Georgia,* 31 U.S. 515, 559 (1832). This right of self-government includes the right to enact tribal laws and enforce those laws against all perons who live on, work at or visit the tribes' reservations. *Williams v. Lee,* 358 U.S. 217 (1959); *Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802, 811 (9th Cir. 2011).

To focus the court's attention on what this case is about, it is important at the onset to tell the court what this case is not about. This is not a case dealing with the interpretation or enforcement of the National Labor Relations Act, the Tribe's Tribal Labor Relations Ordinance, the ability of the Unite Here Local #19 ("HERE") to strike or demonstrate, or HERE's negotiations with the Picayune Rancheria of the Chukchansi Indians ("Tribe") over working hours, wages or the working conditions of HERE members at the Tribe's Chukchansi Gold Resort and Casino ("CGRC").

Instead, this is a case about whether the Tribe has jurisdiction to enforce its Ordinance No. 2025-003 ("Ordinance") establishing procedures regulating the time, place and manner of public assemblies on the Picayune Rancheria ("Reservation") to ensure public safety.

The Tribe asks this Court to confirm the Tribe's sovereign right to enact and enforce the Ordinance, which applies to all persons, both Indian and non-Indian who live, work and visit the Reservation against HERE. The Tribe no longer seeks an injunction against the striking and picketing activities of HERE. Instead the Tribe moves for summary judgment on its request for declaratory relief that the Ordinance is a valid exercise of the Tribe's sovereign authority and that the Ordinance may be enforced against non-members of the Tribe (including the members of Here) on the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Reservation. ECF #2 (Compl. at para. 40 (July 13, 2025)).

As with any government sovereign, the Tribe's ability to exercise its civil regulatory authority consistent with governing law is paramount. The Tribe's exercise of its inherent sovereignty and self-governance in enacting its public assembly Ordinance is authorized by and consistent with governing federal Indian law, under which the Tribe retains its sovereign authority over its territory. This sovereign authority includes the Tribe's exercise of civil jurisdiction over both Tribal members and non-members located on Reservation lands which are owned by the United States of American in trust for the Tribe. The Tribe's enactment and enforcement of its laws— including its Ordinance regulating the time, place, and manner of public assemblies located on its tribal lands—is a necessary and integral exercise of its internal sovereignty. If the Tribe's ability to enact and enforce its laws against persons on the Reservation is not upheld—the ability of the Tribe to govern itself on its Reservation under its own laws will be frustrated, causing the Tribe irreparable harm.

As further explained herein, HERE has refused to comply with the Tribe's public assembly Ordinance by engaging in public assembly activities without being granted a permit to do so, and repeatedly and outright refusing to submit a complete and responsive public assembly permit application to the Tribe.

The Court has jurisdiction over this matter because it is a "civil action[ ], brought by an Indian tribe ... wherein the matter in controversy arises under the . . . laws . . .of the United States," 28 U.S.C. § 1362, because the Tribe seeks to enforce its laws against non-Indian persons including Here. *See Chilkat Indian Vill. v. Johnson*, 870 F.2d 1469, 1473–74 (9th Cir. 1989) (holding that "claims for enforcement of the [tribal] ordinance against the non-Indian defendants do[] arise under federal law" because the heart of the issue was whether some aspect of federal law had deprived the Chilkat Indian Village of their power to regulate non-Indians); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1076–79 (9th Cir. 1990) (same); *Coeur d'Alene Tribe v. Hawks*,

933 F.3d 1052, 1054 (9th Cir. 2019) (noting that *Chilkat* and *Morongo* remain binding, and extending their holdings to actions to enforce tribal court judgments).

For the reasons set forth below, the Tribe respectfully requests that the Court grant its motion for summary judgment, declare that the Tribe has jurisdiction to enforce its Ordinance against HERE, and order HERE to comply with the provisions of the Ordinance.

## STATEMENT OF FACTS

The relevant facts of this case are set forth in the Tribe's Statement of Undisputed Facts ("SUF"), and the Declaration of Tracey Hopkins, Tribal Chairwoman, filed in support of the Tribe's motion for summary judgment. The Tribe will not repeat those facts here, but, rather, incorporates them by this reference as if set forth here in full.

## LEGAL STANDARD

A court shall grant a motion for partial summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), *quoting First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968). In ruling on a motion for partial summary judgment, a court construes the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378-380 (2007).

"If the moving party meets its initial burden . . . the burden then shifts to the nonmoving party, which 'must establish that there is a genuine issue of material fact.'" *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986)). "To carry their burdens, both parties must 'cit[e] to particular parts of

materials in the record . . .; or show [ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Id.* (quoting Fed. R. Civ. P. 56(c)(1)). "[T]he requirement is that there be no *genuine* issue of *material* fact . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## ARGUMENT

I.    **The Tribe's Ordinance is a Valid Exercise of the Tribe's Retained Civil Regulatory Authority and is Enforceable against the HERE and HERE-Member Employees of CGRC.**

The Tribe is a sovereign that is separate from and pre-exists the United States and, as such, has inherent authority to govern its own lands and the conduct of the people thereon. *Wheeler v. United States,* 435 U.S. 313, 322-23 (1978). The Tribe's Ordinance is a valid exercise of its inherent authority and the Court must uphold its enforceability.

"Indian tribes are distinct, independent political communities, retaining their original natural rights in matters of local self-government," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–56 (1978), unless divested of such powers by "federal law or necessary implication of their dependent status." *Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 134, 152 (1980). *See also United States v. Mazurie*, 419 U.S. 544 (1975) (stating that Indian tribes "are 'a separate people' possessing 'the power of regulating their internal and social relations'"). Tribes' retained sovereign powers including the "the right . . . to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220 (1959). This right not only extends the application of tribal laws to tribal citizens, but, as the Supreme Court has repeatedly emphasized, has a "significant territorial component." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982); *see also, e.g.*, *Mazurie*, 419 U.S. at 557 (stating unequivocally that

"Indian tribes are unique aggregations possessing attributes of sovereignty over both their members *and their territory*") (emphasis added). Accordingly, tribes have routinely been recognized as retaining the power to regulate activity on their Indian lands as "a necessary instrument of self-government and territorial management," whether that activity is conducted by a tribe's citizens or by nonmembers of the tribe. *Merrion*, 455 U.S. at 137 (permitting tribal taxation of non-Indians conducting business on the reservation).

Separate from and in addition to tribes' authority to regulate activity on their lands as a "tool[] necessary to self-government and territorial control," tribes retain as a part of their inherent sovereignty the "power to exclude non-Indians from tribal lands." *Id.* at 137, 139. This "authority to exclude non-Indians from tribal land necessarily includes the lesser authority to set conditions on their entry through regulations." *Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802, 811 (9th Cir. 2011). As the Supreme Court has stated: "Nonmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them," and this "power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct." *Merrion*, 455 U.S. at 144.[1]

Moreover, tribes may even, in some instances, retain their sovereign regulatory authority over non-Indians *on non-Indian fee land* within a reservation. *See Montana v. United States*, 450 U.S. 544, 565 (1981) (stating that, "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands"). Specifically, a "tribe may regulate, through taxation, licensing, or other means": (1) "the activities of

---

[1] As the Supreme Court further explained: "When a tribe grants a non-Indian the right to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry." *Merrion*, 455 U.S. at 144. However, a "nonmember who enters the jurisdiction of the tribe remains subject to the risk that the tribe will later exercise its sovereign power"—for example, by enacting regulations that may change or impose new conditions on entry or continued presence on tribal land. *Id.* at 145. In other words, a non-Indian's presence on tribal land when a new or changed tribal regulation is enacted does not somehow immunize the non-Indian from application of the regulation's terms.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, or other arrangements," or (2) "the conduct of non-Indians on fee lands within [the tribe's] reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565–66. These are commonly referred to as the two "*Montana* exceptions."

When the activity a tribe seeks to regulate occurs on land owned by or held in trust by the federal government for the benefit of the tribe, however, the tribe's authority to do so is clear, and there is no need to resort to any analysis of the *Montana* exceptions. *Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802, 811 (9th Cir. 2011).

In *Water Wheel Camp Rec. Area, Inc. v. Larance*, 642 F.3d 802 (9th Cir. 2011), the court upheld the Colorado River Indian Tribes' civil jurisdiction over a non-Indian business and its owner for acts on tribal land (failure to pay rent and refusing to vacate after a lease). The Ninth Circuit reasoned that Montana's restrictions need not even be applied in that scenario because the tribe's inherent authority to exclude and manage its own lands provided an independent basis for jurisdiction. *Id.* at 809-10, 813. Thus, when non-members are on tribal trust land, the tribe's sovereign powers are at their peak and jurisdiction is presumed valid unless clearly limited by Congress.

Thus, the Supreme Court has repeatedly confirmed that tribes have broad civil jurisdiction over non-Indians on tribal lands as an aspect of both their sovereign powers and their property rights as landowners. For example, in *N.M. v. Mescalero Apache Tribe*, 462 U.S. 324 (1983), the Supreme Court upheld the Mescalero Apache Tribe's authority to regulate hunting and fishing by non-members on its reservation. The Court held that state game laws could not be applied to non-Indians on the reservation because they would conflict with the tribe's comprehensive regulatory scheme and undermine tribal self-government. *Id.* at 334-35. This underscores that on trust lands, tribal regulations governing non-member conduct will be respected and will even

preempt state law, reflecting the tribe's primary authority over its own lands.

More recently, the Supreme Court unanimously reaffirmed tribal authority to deal with threats posed by non-Indians on the reservation. In *United States v. Cooley*, 593 U.S. 345 (2021), the Court held that a tribal police officer had inherent authority to detain and search a non-Indian motorist on a public highway running through the reservation, where the non-Indian's conduct appeared to threaten the safety of the tribal community. *Id.* at 350-51. Although *Cooley* was a criminal jurisdiction case, the Court explicitly recognized that Montana's second exception, covering conduct that threatens the health or welfare of the tribe, fits", almost like a glove" in such situations, and it confirmed that tribes need not tolerate dangerous behavior by non-members on reservation roads simply because the offenders are non-Indian. *Id.* at 350 (quoting *Mont. v. United States*, 450 U.S. 544, 566 (1981)).

Here, because CGRC is located—and Here's public assembly activities has occurred—on the Tribe's Reservation  trust land,  the Tribe plainly has the power to regulate activity thereon without any reference to the *Montana* factors, based on its retained sovereign powers related to "self-government and territorial management," and based on its retained sovereign "power to exclude" individuals from such land if they do not comply with various terms of entry or continued presence. *Merrion,* 455 U.S. at 137.  Here organizers and members—even those who are non-Indian—who enter the Reservation to picket are subject to neutral non-discriminatory conditions the Tribe places on such conduct on its tribal lands, including the Tribe's Public Assembly Ordinance.

Even if the HERE picketing were not occurring on trust lands, but instead were occurring on non-Indian fee lands within the Reservation, in this case, the *Montana* factors would be satisfied and the Tribe's regulation of HERE's public assembly activities nevertheless valid  for two separate and independently sufficient reasons: HERE members have entered into consensual relationships with the Tribe and because

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

its members failure to abide by the terms of the Tribe's Ordinance directly effects, and threatens, the Tribe's political integrity and the health and welfare of the Tribe. *See Montana*, 450 U.S. at 565–66; *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) (affirming that a government "clearly has a legitimate interest in the continued enforceability of its own statutes").

Furthermore, in *Cardin v. De La Cruz*, 641 F. 2d 363 (9th Cir. 1982), the Quinault Indian Tribe sought to regulate the business of a non-Indian grocery and general store located on non-Indian owned fee land within the Quinault Indian Reservation by enforcing its tribal building, health, and safety ordinances. *Id.* at 364 . The Ninth Circuit found that the tribe's "exercise of civil jurisdiction over [the store owner's] business" satisfied "both of the broad categories in which, according to *Montana*, Indian tribes retain their sovereign powers." Specifically, the court found that the store owner had "entered consensual relationships" with the tribe by engaging in "commercial dealing" on his fee lands located within the reservation boundary, thereby satisfying the first *Montana* factor. *Id.* at 366 (cleaned up). Additionally, the court found that the store owner's "conduct that the [t]ribe [was] regulating 'threaten[ed] . . . the health or welfare of the [t]ribe," thereby satisfying the second *Montana* factor. *Id.* When the store owner had originally bought the store and land it occupied from a previous owner, the tribe had met with him to discuss "measures that the [t]ribe wanted taken" to "correct certain alleged dangerous and unsanitary conditions" at the premises that "purportedly violated tribal building, health, and safety regulations." *Id.* at 364. The store owner had reopened the store without taking any of the measures to bring the premises into compliance with the tribal safety regulations. *Id.*

Similarly, here, HERE members have entered into consensual relationships with the Tribe by entering into employment with CGRC, a commercial entity of the Tribe, to work at CGRC. HERE organizers, for their part, even if not employed at CGRC, are

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

representatives of the union that is the recognized labor organization representing CGRC employees. By choosing to be employed by CGRC and choosing to represent an organization that is the recognized labor organization of CGRC employees, and knowing that CGRC is an entity of the Tribe, HERE members and organizers have entered into consensual relationships with the Tribe.

In addition, by engaging in demonstrations and picketing activity on the Tribe's lands without adherence to the terms of the Tribe's Ordinance, which regulates the time, place, and manner of public assemblies in order to ensure that the assemblies are conducted in a way that protects the safety of those in attendance, as well as those who may encounter such an assembly, for example when coming or going from work or in their patronage of CGRC, HERE members and organizers are engaging in activity that clearly and directly effects the safety and welfare of the Tribe. Just as with the store owner's actions in *Cardin*—failing to come into compliance with tribal building, health, and safety ordinances—the complete failure and refusal of HERE and its members and organizers to abide by the Tribe's laws is a clear affront to the Tribe's sovereign authority and thus threatens the Tribe's political integrity. As such, even if they did apply, and they don't, since all HERE activities are occurring on Tribal trust land, both *Montana* factors would be satisfied thereby subjecting HERE's members and organizers to the jurisdiction of the Tribe.

## II.   The Tribe's Public Assembly Ordinance is Standard among Governments Seeking to Manage Assemblies and Demonstrations to Protect Governmental Interests and the Public Interest.

As an initial matter, it is important to note that the U.S. Constitution and its Bill of Rights do not apply to Indian tribes. *Talton v. Mayes*, 163 U.S. 376 (1896). The Tribe is a "separate sovereign[] pre-existing the Constitution," and is governed by its own constitution, law, and customs. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978).

Congress, in exercise of its authority over tribal governments, enacted the Indian

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Civil Rights Act ("ICRA") to restrict the powers of tribal governments in ways "similar, but not identical, to those contained in the Bill of Rights." *Santa Clara Pueblo*, 436 U.S. at 56–58. ICRA, relevantly, prohibits a "tribe in exercising powers of self-government" from "abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances." 25 U.S.C. § 1302(a)(1). But, beyond the general fact that tribal sovereignty "provides a backdrop against which the applicable treaties and federal statutes must be read," *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 172 (1973), ICRA itself demonstrates broad commitment to the sovereignty of tribal governments, for instance by limiting the remedies it provides to a petition for a writ of *habeas corpus*. *See generally Santa Clara Pueblo*, 436 U.S. 49. Thus, the broad principles stated in ICRA must be construed "with due regard for the historical, governmental and cultural values of an Indian tribe" and are not "always given the same meaning as they have come to represent under the United States Constitution." *Tom v. Sutton*, 533 F.2d 1101, 1105 n.5 (9th Cir. 1976); *see also Howlett v. Salish & Kootenai Tribes of Flathead Rsrv., Montana*, 529 F.2d 233, 238 (9th Cir. 1976) (discussing equal protection); *Randall v. Yakima Nation Tribal Ct.*, 841 F.2d 897, 900 (9th Cir. 1988) (discussing due process).

As demonstrated below, the Tribe's Ordinance would satisfy even the rigorous requirements of the First Amendment. Because the Ordinance would satisfy the First Amendment, it is necessarily permissible under ICRA's standard, which includes deference to tribal sovereignty.

1.    <u>The Tribe's Public Assembly Ordinance is Content-Neutral, Narrowly Tailored, and Leaves Open Ample Alternative Means of Communication.</u>

The Tribe's Public Assembly Ordinance would survive review even under the First Amendment because: "(1) it is content neutral; (2) it is narrowly tailored to serve a significant government interest; and (3) it leaves open ample alternative means of communication." *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 862 (9th Cir. 2001).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

1  This is all that would be required for a government body subject to the U.S.

2  Constitution to impose time, place, and manner restrictions on public picketing and

3  protests. *Id.*

4      The Ordinance requires that organizers of "[p]ublic assemblies, meetings,

5  gatherings, demonstrations, parades, and other public expressions of view . . . within

6  the Reservation" must seek a permit at least seven days before the planned event. SUF,

7  p. 4, ¶ 10, Ex. C, Ordinance §§ 1.010–1.020.  Applicant organizers are then guaranteed

8  a permit "without unreasonable delay" unless: (1) "[a] prior application for a permit

9  for the same time and place has been submitted . . . and the activities authorized by that

10  permit do not reasonably allow multiple occupancy of that particular area"; (2) "[i]t

11  reasonably appears that the event will present a clear and present danger to the public

12  health or safety"; or (3) "[t]he event is of such nature or duration that it cannot

13  reasonably be accommodated in the particular location applied for, considering such

14  things as damage to facilities or interference with regular Tribal business." *Id.* § 1.030.

15  In the event a permit is denied, the person seeking the permit will be informed in

16  writing, with a statement of reasons.  *Id.* § 1.040.

17      The Ordinance is content neutral because "it is 'justified without reference to the

18  content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791

19  (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

20  The Ordinance is facially neutral: neither its requirement of a permit nor the narrow

21  conditions under which a permit will not be granted are dependent on the content of

22  the proposed protest.  *Id*. §§ 1.010, 1.030; *see also Edwards*, 262 F.3d at 862. In the

23  Ninth Circuit, this is all that is required to show content neutrality. *Menotti v. City of*

24  *Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) ("In assessing whether a restraint on

25  speech is content neutral, we do not make a searching inquiry of hidden motive; rather,

26  we look at the literal command of the restraint.").

27      The Ordinance is narrowly tailored because it supports substantial government

28

interests in coordinating competing uses of space, maintaining public safety, and preventing damage to government property. *E.g.*, *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1038 (9th Cir. 2006) ("As we have noted, local governments can exercise their substantial interest in regulating competing uses of traditional public fora by imposing permitting requirements for certain uses."); *Edwards*, 262 F.3d at 863 ("There is no doubt that [a government] has a substantial interest in safeguarding its citizens against violence."); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) ("[t]here is a substantial Government interest in conserving park property . . . .").

Previous public assembly activities on the Tribe's Reservation trust lands demonstrate the need for such regulations. For example, as included in the findings section of the Ordinance, "people have conducted demonstrations on the Reservation that have blocked public access to the Casino and Tribal buildings; have engaged in conduct that has harassed patrons of the Casino; and have engaged in loud noises and demonstrations that has posed a threat to public safety and welfare." SUF, p. 4, ¶ 10, Ex. C, Ordinance § 1.4. Furthermore, even if there were "some imaginable alternative that might be less burdensome on speech," the Ordinance would be valid under the First Amendment so long as the interests it supports "would be achieved less effectively absent the regulation" and it does not "burden substantially more speech than is necessary." *Ward*, 491 U.S. at 797, 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). The Tribe's significant interests "would be achieved less effectively absent the" Ordinance because, without it, the Tribe would be placed in a purely reactive posture whenever a disruptive protest occurred. *Ward*, 491 U.S. at 799 (quoting *Albertini*, 472 U.S. at 689). For example, faced with protesters who harassed Tribal citizens or invaded government buildings, the Tribe would need to summon help from outside law enforcement, who may be distant, otherwise engaged, or simply non-responsive. Likewise, it is impossible to coordinate conflicting uses of public space

when both uses come as a complete surprise.

Nor does the Ordinance "burden substantially more speech than is necessary," because the only burden it imposes, besides its direct regulation on conflicting uses, violence, and property damage, is that the organizer of a proposed event submit a free application, seven days in advance of the planned assembly. *Id.*, Ordinance §§ 1.020-1.030; *Ward*, 491 U.S. at 799; *see also, e.g.*, *Santa Monica Food Not Bombs*, 450 F.3d at 1049 (discussing the problems posed by fee provisions in time, place, manner ordinances). To the extent such a brief period of prior notice need be justified, it is plainly justified here by the time requirements for the Tribe's limited administrative staff to examine an application, check for potentially conflicting applications, "assess what services (such as additional police) are needed[,] contact those services[,] ensure their availability[,] and allow those services to prepare for the events," especially as the Tribe must work with outside entities, including law enforcement, instead of merely contacting another department under the same governmental umbrella, as a California city is able to do. *Santa Monica Food Not Bombs*, 450 F.3d at 1045; *cf. N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1356-57 (9th Cir. 1984) (discussing how "most cities" need only short periods to check for competing uses and prepare for traffic disruption, are able to deploy their own police on two days' notice, and can provide notice of traffic disruptions 24 hours in advance).

Nor does the ability of the Tribe to place conditions on issuance of permits "as are reasonably consistent with protection and use of any area under permit . . . [,] on the equipment used, noise levels[,] and the time within which the event is allowed," alter this conclusion. *Id.*, Ordinance § 1.060. These possible conditions are precisely defined and go directly to supporting the Tribe's interests in preventing property damage, coordinating competing uses, and maintaining public safety. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1028–29 (9th Cir. 2009) (holding that ability of city to impose "reasonable requirements . . . as [are] necessary to

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

coordinate multiple uses of public property, assure preservation of public property and public places, prevent dangerous, unlawful or impermissible uses, protect the safety of persons and property and to control vehicular and pedestrian traffic in and around the venue" was permissible (emphasis omitted)). Likewise, the restriction that no permit will be issued for a location where the proposed activity would damage Tribal property, "unreasonabl[y] impair" natural resources, interfere with Tribal government, or "[p]resent a clear and present danger to public health and safety," goes directly to the Tribe's interests in preventing property damage, coordinating competing uses, and maintaining public safety. *Id.*, Ordinance § 1.050.

Finally, the Ordinance leaves open ample alternative means of communication because it preserves an organizer's "'reasonable opportunity' for communication." *Menotti*, 409 F.3d at 1141 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986). The Tribe's reservation is not large: organizers may avoid being subject to the Ordinance merely by moving their protest a few hundred yards in any direction. SUF, p. 8, ¶ 28. Such a move would not prejudice their ability to communicate to CRGC patrons, as they could protest within sight of the casino where the two access roads enter or exit the reservation. *Id.*; *cf Edwards*, 262 F.3d at 866 (discussing whether a speaker may "reach[] his intended audience"). In addition, by contrast to the complete ban of the TLRO on strike-related picketing activity on the Tribe's Indian lands, an organizer could protest on the Tribe's land under the Public Assembly Ordinance simply by filing a free application for a permit, which are guaranteed to be granted unless the proposed event cannot be coordinated with others already planned or poses clear risks to public safety or property. *Compare* TLRO §11(b), *with* Public Assembly Ordinance §§ 1.010–1.030. SUF, p. 4, ¶ 10. Thus, the lesser regulation of the Public Assembly Ordinance allows an avenue for demonstration in accord with the Tribe's decision to enact a law that does not include an outright ban.

Accordingly, even if the First Amendment directly applied to the Tribe, the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Public Assembly Ordinance would be compliant with its requirements. Because the Ordinance complies even with the requirements of the First Amendment, it is also permissible under the more flexible standards of ICRA, which must be construed "with due regard for the historical, governmental and cultural values of an Indian tribe." *Tom*, 533 F.2d at 1105 n.5; *see also Santa Clara Pueblo*, 436 U.S. 49 (discussing how ICRA protects tribal sovereignty).

   2. <u>The Tribe Seeks Only to have HERE Comply with the Law.</u>

  At this time, the Tribe seeks only that HERE comply with the Ordinance on a coequal basis with all other persons and entities seeking to conduct public assemblies on the Tribe's Reservation land.  As discussed above, the Ordinance is a valid exercise of the Tribe's inherent sovereignty and arises from needs to coordinate potentially competing uses of public space, maintain public safety, and prevent damage to Tribal and non-Indian realty and personal property.  Though the Tribe would obviously prefer that CRGC and HERE have reached some mutually agreeable resolution, the Tribe has no objection to HERE's activities so long as they are conducted in accord with the Ordinance, as shown by its grant of a temporary permit to HERE for July 19–21 on an incomplete application. HERE is not entitled to an exception from the Ordinance's requirements and it is plainly able to give notice of its planned activities. SUF, pp. 6-8, ¶ 10-28 (noting that the Union gave notice on July 2 and 12 of its intent to strike); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101–02 (1972) (holding that it was unconstitutional for Chicago to permit only labor picketing).

   3. <u>The Public Assembly Ordinance Provides an Appeal to Aggrieved Parties.</u>

  Lastly, the Ordinance provides an appeals process for any person who feels they were incorrectly or unfairly denied a permit, which permits both written submissions and requests for oral hearing. SUF, p. 4, ¶ 10, Ex. C, Ordinance § 1.110. To the extent that HERE is denied a permit or found in violation thereof and assessed a fine, they

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

may avail themselves of the Ordinance's appeals process to challenge the amount of the fine or the finding of violation.

### III.    The Federal Court Has Jurisdiction to Issue a Permanent Injunction Despite the Norris–LaGuardia Act.

HERE may argue that the Norris–LaGuardia Act ("NLA"), 29 U.S.C. §§ 101 – 115, deprives this Court of jurisdiction to issue an injunction here, arguing this is a labor dispute governed by the NLA. It is true that the NLA, enacted in 1932, sharply limits federal courts' power to grant injunctions "in case involving or growing out of labor dispute" *Id.* § 101. In particular, 29 U.S.C. § 104, provides that no federal court shall issue any restraining order or injunction prohibiting certain enumerated acts in the context of a labor dispute. Those protected acts include, for example, workers' stopping work, joining labor organizations, publicizing their grievances, and "assembling peaceably" to promote their interests. *Id.* § 104(a) –(e). The overarching intent of the Act was to prevent federal judges from using injunctions to break strikes, stop picketing, or otherwise interfere on behalf of management in labor conflicts. Congress sought to end the era of sweeping "yellow-dog contract" injunctions and protect workers' rights to organize and protest. *See generally, Boys Mkts., Inc. v. Retail Clerk's Union*, 398 U.S. 235, 251-52 (1970) (discussing history and purpose of the NLA).

Importantly, however, the Norris–LaGuardia Act does not strip federal courts of *all* injunctive power in every labor-related situation. The Act itself contains a critical exception: 29 U.S.C. § 107, allows a federal court to issue an injunction in a labor dispute in very narrow circumstances when unlawful conduct is occurring and no other remedy is adequate. In essence, even in a labor dispute, a court may act to protect life or property if certain stringent prerequisites are met. 29 U.S.C. § 107 sets a high bar, requiring the court to hold an evidentiary hearing and explicitly find *all* of the following before an injunction can issue after due notice to the defendants and an opportunity to be heard:

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

- **(a)** that unlawful acts have been threatened or committed by the defendants and will likely continue unless restrained;

- **(b)** that substantial and irreparable injury to the plaintiff's property will result if an injunction is denied;

- **(c)** that the harm to the plaintiff if relief is denied exceeds the harm to the defendants if relief is granted;

- **(d)** that the plaintiff has no adequate remedy at law (i.e. money damages would not make the plaintiff whole); and

- **(e)** that public officials are unable or unwilling to furnish adequate protection for the plaintiff's property.

*See Id.* § 107 (enumerating required findings). Only if all these findings are made (and the plaintiff posts an appropriate bond, per *Id.* § 109) may a court issue an injunction in a case involving a labor dispute. This statutory scheme reflects Congress's intent to make court injunctions against labor activity a *last resort* and available only to prevent serious unlawful conduct or irreparable harm, and not to interfere with legitimate labor rights.

Furthermore, over the years courts have recognized certain important exceptions or clarifications to the NLA's broad injunction ban. One such example is the *Boys Markets* decision, where the Supreme Court carved out a narrow exception to accommodate federal labor policy favoring arbitration. In *Boys Mkts., Inc. v. Retail Clerks Union*, 398 U.S. 235 (1970), the Court held that despite Norris–LaGuardia, a federal court may enjoin a strike that violates a clear no-strike obligation in a collective bargaining agreement, when that agreement contains a mandatory arbitration clause for the underlying dispute. *Id.* at 254-55. In that scenario, the union by contract has agreed to resolve disputes through arbitration instead of striking, so an injunction to enforce the agreement (by halting the strike and compelling arbitration under 29 U.S.C.

§ 301 of the LMRA) is permissible. *Id.* § 252-53. The *Boys Markets* exception is tightly limited to its facts, but it illustrates that the NLA's prohibition is not absolute – the Act will yield where necessary to enforce a mutually agreed arbitral remedy or other strong federal labor policy.

Another significant execption example is *United States v. United Mine Workers*, 330 U.S. 258 (1947). There, the Supreme Court upheld a federal injunction (and later contempt sanctions) against a nationwide coal strike that occurred while the U.S. government had seized and was operating the mines during wartime. The union argued that the Norris–LaGuardia Act barred the injunction. *Id.* at 268-69. The Supreme Court disagreed, holding that the term "employer" in the Act's jurisdiction-stripping provisions did not include the United States as the operator of the mines. *Id.* at 270-71. Congress had not intended to prevent the government from obtaining injunctions to protect the public interest. *Id.* at 272. Moreover, the Court reasoned that even if the NLA *did* apply, a district court confronted with a sudden, perilous strike could issue a temporary restraining order to preserve the status quo while it determines its jurisdiction and adjudicates the dispute. *Id.* at 289-90. In short, *United Mine Workers* makes clear that courts are not utterly powerless to issue injunctions in the face of strikes that imperil public health or safety, particularly when a sovereign government is the party seeking relief. *See Id.* at 272 ("we cannot construe the general term 'employer' to include the United States where there is no express reference to the United States and no evident affirmative grounds for believing that Congress intended to withhold an otherwise available remedy from the Government as well as from a specified class of private persons."); *Id.* at 270 (court may act to preserve status quo pending resolution of jurisdictional questions). Here, the Tribe is a sovereign government, and its effort to protect the reservation community is analogous in principle to the government action in *United Mine Workers*. The NLA should not be read to disable the Court from granting relief in this unique situation.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Additionally, courts have drawn a distinction between enjoining the core labor dispute (which the NLA forbids) and enjoining unlawful conduct incidental to that dispute. The Norris–LaGuardia Act was never intended to give unions immunity to commit crimes, trespass or engage in conduct that puts at risk the public safety. Thus, federal and state courts have allowed injunctions aimed at preventing violence, mass picketing that blocks ingress or egress, vandalism, and similar unlawful acts, even though those acts occur in connection with a labor dispute. *See generally Id.* at 303-04 (recognizing that NLA does not protect conduct endangering public order). A leading example is *Sears v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180 (1978). In *Sears*, union picketers were trespassing on the employer's private property which was a retail store parking lot. Sears sought a state-court injunction to remove them for trespass, but the union argued that jurisdiction lay exclusively with the NLRB under federal labor law. The Supreme Court held that the state court could enjoin the trespassory picketing. The crucial reasoning was that the issue in the state case – the location of the picketing and the company's property rights – was different from any issue that could have been presented to the NLRB (which might consider the *objectives* of the picketing under federal law). *Id.* at 198-200. Because the employer's claim was rooted in trespass, not an unfair labor practice, adjudicating that claim posed "no realistic risk of interference with the NLRB's primary jurisdiction" over labor matters. *Id.* at 198. In other words, enjoining the illegal aspects of the union's conduct, the unauthorized occupation of private property did not infringe on the union's fundamental labor rights or the processes of the NLRB. Following this principle, courts have acknowledged that Norris–LaGuardia does not bar court orders that narrowly target unlawful behavior such as blocking doorways, assaulting people, or destroying property, as opposed to orders that would compel or prohibit *peaceful picketing or striking as such*. The Act was meant to protect workers' lawful concerted activities, not to shelter violence or trespass. Thus, an injunction that abates illegal conduct

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

related to a labor dispute can be consistent with the Act, so long as it does not restrain the legitimate exercise of workers' rights including the expression of their grievances or their choice to stop work.

**IV.    Tribe's request for a Permanent Injunction Order falls within the permissible bounds of court action despite the Norris–LaGuardia Act.**

The Tribe's request for a permanent injunction falls well within the permissible bounds of court action despite the Norris–LaGuardia Act. Crucially, the injunction sought here is *not* an order to stop HERE from picketing or to force employees back to work. The Tribe is *not* trying to win the labor dispute in court or silence the union's message. Instead, the Tribe seeks to enforce neutral time, place, and manner regulations, in this instance basic safety rules, on tribal land, to ensure that the ongoing picketing does not threaten lives, public safety, or critical infrastructure. Granting the injunction would not undermine the policies of Norris–LaGuardia, for several reasons: (1) the Tribe's request for an injunction is permissible despite the Norris–LaGuardia Act because it is narrowly focused on safety and does not interfere with the union's lawful protest; (2) the injunction does not halt the strike or picketing; and (3) the injunction only imposes reasonable time, place, and manner limits (like keeping doorways and fire lanes clear) to ensure the demonstration stays safe. The Tribe is not trying to silence the union or win the dispute in court—only to avert threats to life and property—so HERE's core rights under the NLA remain intact.

Moreover, the injunction regulates conduct, not the content of the protest or the right to strike. If HERE follows the Tribe's safety rules, it can continue protesting; the order restrains them only if they commit illegal acts like blocking emergency access, threatening people, or trespassing in restricted areas. Such dangerous acts are not protected by the NLA, and Section 7 of the Act allows courts to enjoin "unlawful acts" that would cause irreparable harm. In fact, the picketers have already created imminent hazards (e.g. jumping in front of moving cars), underscoring the need for relief.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Stopping these illegal behaviors via injunction does not undermine the Act's purpose, because Norris–LaGuardia was never meant to shield violence, trespass, or property damage under the guise of picketing. As the landowner, the Tribe is entitled to enforce trespass and safety rules on its property, and doing so here through a court order does not muzzle HERE's message.

Moreover, the Tribe is acting in a sovereign capacity to protect the public, which is far from the scenario Congress targeted with the NLA. The Tribe's role is akin to a city maintaining order during a protest—a context outside the Act's core concern. Indeed, courts have recognized that the Act's injunction ban does not apply when a government seeks an order to preserve public safety (for example, the Supreme Court allowed an injunction when the U.S. intervened in a national miners' strike). Here, the Tribe is simply enforcing a neutral safety ordinance on its own land. Denying relief, only to have chaos or injury occur on the Reservation, would pervert the Act's intent. It is more equitable to prevent such harm now (the injunction can always be lifted later) than to risk a tragedy by inaction.

Finally, no alternative remedy exists to protect the Tribe's interests. Tribal police have little power over non-Indian picketers, and state authorities lack jurisdiction on the Reservation; nor can any federal agency (like the NLRB) provide timely help, since they cannot enforce tribal law or swiftly stop dangerous conduct. Moreover, the Tribe is currently establishing its Tribal court, so there is no Tribal court that can exercise jurisdiction over people that violate Tribal law. Thus, without a federal injunction, the Tribe has no practical way to prevent imminent harm. All the prerequisites of NLA § 107 are satisfied: unlawful acts are occurring, the Tribe faces irreparable injury, no adequate legal remedy exists, and other authorities cannot fully protect the community. The balance of hardships also favors the Tribe, as the injunction still allows the HERE's lawful protest to continue while simply averting grave dangers.

In sum, the injunction honors Norris–LaGuardia's policy by preserving HERE's

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

rights while preventing serious harm. It strikes an appropriate balance between protecting lawful labor activity and ensuring public safety on tribal land, fitting squarely within the Act's narrow exceptions.

## V.   The HERE's Violation of the Tribe's Ordinance Interferes with the Tribe's Right to Self-Government in Violation of Federal Law Causing the Tribe Irreparable Harm.

The Tribe is a federally recognized Indian tribe which has organized a Tribal government under a written constitution. SUF, p. 2, ₧ 2. Its governing body, the Tribal Council, exercises sovereign authority over internal matters, including the regulation of public assemblies under the Tribe's Ordinance. SUF, p. 4, ₧ 10, Ex. C.

Pursuant to this authority, the Tribal Council enacted the Public Assembly Ordinance. SUF, p. 4, ₧ 10.

The Public Assembly Ordinance comprehensively regulates the time, place , and manner under which persons and entities can demonstrate on the Reservation in order to ensure the public safety. Pursuant to this Ordinance, the Tribe requested that HERE make application for a permit identifying a time and place on the Reservation where the Union could demonstrate. Nothing in the Ordinance pertains to Tribal employees working hours, wages or working conditions. SUF, pp. 4-6, ₧₧ 11-18. Nothing in the Ordinance restricts a person's or entities' right to demonstrate or restricts the content of their right to the exercise of their free speech.  Instead, the Ordinance simply allows the Tribe to place reasonable restrictions on the demonstrators so that they don't block public roads or sidewalks, create noises that exceed the noise restrictions set forth in the Tribe's zoning ordinance; and block fire lanes and emergency vehicle access and other similar restrictions that ensure public safety.

Despite this valid exercise of tribal sovereignty, HERE refused or failed to make application for a permit and carried out a demonstration in direct violation of the Ordinance.

It is a fundamental principle of federal Indian law that tribes retain the inherent

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

right to self-government, including the sovereignty and "'the power of regulating their internal and social relations.'" *New Mexico v. Mescalero Apache Tribe,* 462 U.C. 324, 332 (1983) (citing *United States v. Kagama,* 118 U.S. 375, 381-82 (1886)). Tribes have the "power to make their own substantive law in internal matters and to enforce that law in their own forums." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55 (1978); *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 18 (1987); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148 n.14 (1982); *United States v. Wheeler,* 435 U.S. 313, 322 (1978); *Ex parte Crow Dog,* 109 U.S. 556, 572 (1883). This includes the Tribe's power to regulate the conditions under which persons and organizations can enter, remain on and demonstrate on the Reservation.

HERE's demonstration without a permit issued by the Tribe under the Ordinance violated the Tribe's sovereign right to govern itself, its members and all persons who work, visit and live on the Reservation.

The Supreme Court has long held that state interference with tribal self-governance is impermissible. In *Williams*, 358 U.S. at 220, the Court emphasized that the key question is "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." Here, the answer is unequivocally yes.

HERE's actions in refusing to apply for a permit, conducting a demonstration without a permit and engaging in conduct that threatened the public safety not only violates the Tribe's sovereign authority, but also causes the Tribe irreparable harm.

Courts have consistently recognized that unlawful encroachments on tribal jurisdiction constitutes irreparable injury. *See EEOC v. Karuk Tribe Hous. Auth*., 260 F.3d 1071, 1077 (9th Cir. 2001) ["Assuming that the Tribe is correct in its analysis with respect to jurisdiction, **the prejudice of subjecting the Tribe to a subpoena for which the agency does not have jurisdiction results in irreparable injury vis-a-vis the Tribe's sovereignty**."] (emphasis added); *Prairie Band of Potawatomi Indians v.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

*Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (state interference with tribal sovereignty constitutes irreparable harm); *Comanche Nation v. United States*, 393 F. Supp. 2d 1196, 1205–06 (W.D. Okla. 2005) (tribes are irreparably harmed by unlawful deprivations of their jurisdictional authority); *Choctaw Nation of Oklahoma v. State of Oklahoma*, 724 F. Supp. 2d 1182, 1187 (W.D. Okla. 2010) (same).

The Tenth Circuit's decision in *Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015), is particularly instructive. There, the court held that repeated enforcement of state laws against tribal members on the reservation—despite clear precedent to the contrary—constituted a serious and ongoing infringement on tribal sovereignty. The court condemned the state's actions as a "renewed campaign to undo tribal boundaries" and found that such interference created "the prospect of significant interference with [tribal] self-government." *Id*. at 1013.

The same is true here. The Tribe has been forced to divert scarce resources away from essential services—such as elder care and educational support—to defend enforce its laws and sovereignty. This financial and institutional burden further undermines the Tribe's ability to govern effectively.

Each time HERE violates Tribal law on the Reservation, it unlawfully displaces the Tribe's authority to govern its members under its own laws. This is a direct violation of federal common law, which recognizes that tribal governments—not non-Indian organizations—have the exclusive authority to regulate internal matters within a tribe's reservation. *See Williams*, 358 U.S. at 220.

Accordingly, HERE's violations of Tribal law constitute an impermissible intrusion into the Tribe's sovereign domain and provides an independent basis for granting summary judgment in favor of the Tribe.

## CONCLUSION

The Norris–LaGuardia Act does not strip this Court of the power to issue the carefully tailored limited permanent injunction that the Tribe seeks. Granting the Tribe's motion for summary judgment would harmonize the federal policy protecting

labor rights with the equally compelling policy of allowing Indian tribes to govern themselves on their lands and protect not only their citizens but all persons that live, work, and visit the Reservation. The proposed injunction is tailored to prevent unlawful, dangerous conduct without enjoining the lawful aspects of the current labor negotiations. The Tribe's request has nothing to do with the NLRA, union negotiations or union wages, working hours or working conditions. This scenario fits within recognized exceptions to the NLRA: it involves trespass and threats to public safety (which can be enjoined consistent with *Sears* and 29 U.S.C. § 107's provisions), and it is brought by a sovereign government to avert a crisis (analogous to the *United Mine Workers* context). Upholding federal jurisdiction here affirms that courts can protect the public interest and enforce generally applicable laws even in the midst of union negotiations, so long as the workers' core rights to strike and speak out are preserved. The Tribe's status as a sovereign authority further insulates this action from the core concern of Norris–LaGuardia, and the Tribe stands ready to comply with all procedural safeguards of the Act to ensure that the relief is lawfully issued. Accordingly, this Court has jurisdiction and sound legal grounds to issue the permanent injunction notwithstanding the Norris–LaGuardia Act, in order to prevent irreparable harm and uphold the rule of law on the Reservation.

As demonstrated above, this Court has jurisdiction to declare that the Tribe has the clear authority to enact the Ordinance regulating conduct on its Reservation lands, by persons thereon, and that the Ordinance may be enforced as to any person or entity on the Tribe's Reservation land, including HERE, its member employees of CGRC, and its organizers.

For these reasons and the reasons stated above the Court should grant the Tribe's motion of summary judgment.

Dated: August 13, 2025                          Respectfully Submitted,

LAW OFFICES OF RAPPORT AND MARSTON

By:    /s/ *Lester J. Marston*
       Lester J. Marston
       405 West Perkins Street
       Ukiah, California 95482
       Telephone: 707-462-6846
       Facsimile: 707-462-4235
       Email: ljmarston@rmlawoffice.net

HOBBS, STRAUS, DEAN & WALKER, LLP

By:    /s/ *Adam P. Bailey*
       Adam P. Bailey
       HOBBS, STRAUS, DEAN & WALKER, LLP
       1903 21st Street, 3rd Floor
       Sacramento, CA  95811
       Phone: 916-442-9444
       Fax: 916-442-8344
       E-mail: abailey@hobbsstraus.com
       rfrye@hobbsstraus.com

       *Attorneys for Picayune Rancheria of*
       *Chukchansi Indians dba Chukchansi*
       *Gold Resort & Casino*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

## CERTIFICATE OF SERVICE

I am employed in the County of Mendocino, State of California. I am over the age of 18 years and not a party to the within action; my business address is that of the Law Offices of Rapport & Marston, Sole Practitioners, 405 West Perkins Street, Ukiah, CA 95482.

I hereby certify that I electronically filed with the Clerk of the United States District Court for the Eastern District of California by using the CM/ECF system on August 13, 2025, which generated and transmitted a notice of electronic filing to the CM/ECF registrants in this matter.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this document was executed on August 13, 2025.

*/s/ Ericka Duncan*
ERICKA DUNCAN, Declarant

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT